Lisa, can we call the next case? 15-0208, People v. Cortez-Moore. Okay, can the attorneys at Cortez-Moore please approach the podium? Identify yourselves for the record. Good morning. I'm Jennifer Bontrager from the State Appellate Defender. Could you spell your last name for me? B-O-N-T-R-A-G-E-R. Thank you. That's the name on the briefs. For Cortez-Moore. Good morning, Your Honors. Assistant State Attorney Alan Spellberg representing the people of the State of Illinois. The big guns are coming out for this one, huh, Mr. Spellberg? Yes, I'm here because the attorney who wrote the briefs, Peter Maltese, retired last month after 30 years representing the people and the citizens of Cook County. Aha. Ms. Bontrager, we're going to hold you to 15 minutes. Did you want to reserve some time for rebuttal? Yes, please. I'll take two minutes. Great. All right. You can have a seat. And, Ms. Bontrager, you may begin. Once again, good morning, and may it please the Court. Again, I'm Jennifer Bontrager for Cortez-Moore. With seven substantive issues in the briefs, I'm, of course, here to answer your questions on any of them. But unless Your Honors prefer otherwise, I was planning to start at the beginning with the prosecutor's misconduct in her opening statement. The purpose of an opening statement is to apprise the jury of what the party expects the evidence will show. Instead of doing that, in this case, the prosecutor transformed the opening statement into an argument in which she told the jurors that Khalil Cromwell, Jr. Was the superhero's argument the only thing you think the prosecutor did wrong in the opening statement? I mean, her theme of likening the responding Chicago police officers to superheroes and creating this – priming the jury to find the state's witnesses more credible by reminding them – this blatant ploy to remind them that there's a child in the house, even though he was not harmed in any way. He was not even touched by any of them. He was an infant at the time. At the time of trial, he was a toddler, but he was an infant at the time of the crime. He was eight months old, as I understand it. Was it fair game to mention his age in the opening statement? It's an element of one of the crimes, right? It was an element of the home invasion that named him as a victim. It's also an aggravating – It's a sensing aggravation. He was under the age of 12. It's an aggravating factor, so why isn't that appropriate? I'm sorry? Why isn't that appropriate to talk about his age? I'm saying it's fine to talk about his age. It's just that he – The superhero. Which the state concedes they never even proved up that he loved superheroes at the age of four, and it's irrelevant – he was eight months old at the time. We don't contest that, and I don't think it was wrong for that to be mentioned, but this blatant reminding them that there's a child there and that he loves superheroes and that he conjures them in his imagination and watches them in animation – Well, it bolsters the state's witnesses' reputation and abilities and whatever they did that night. I think we can all agree that it's a bolstering of it, but do you think that was significant enough that it impacted the jury's verdict? Absolutely. I mean, they're instructed, don't pay attention to closings and openings. They're not evidence. So how is that one argument enough to outweigh all of the evidence in this case, which was significant? I disagree that there was significant evidence particularly implicating my client in – Wasn't he found climbing out the window? No. He was – Didn't he have the defendant – I'm sorry, I might be confusing him with the co-defendant, but didn't he have one of the victim's wallets on him? He had a mask in his pocket. He did, but that's it. He was not seen leaving. And you don't think that's significant evidence? I think it's pretty minimal evidence. It's nothing particularly valuable. The wallet had nothing other than an ID in it. Other than somebody who was just the victim of an armed robbery. It had nothing valuable in it. It's significant evidence of his culpability. I disagree. He could have picked that up had it been discarded by another offender. Within minutes of the armed robbery happening. Yes. I think that's not outside the realm of possibility. Okay. But it's still merely circumstantial evidence. None of those occupants, none of the occupants of the apartment identified him as one of the offenders. None of the DNA – Because he had the mask that was identified by the victims in his pocket. That mask would not be identified. That mask had other DNA on it that he was excluded from, and his DNA was not on any of the other masks. So he just picked that up on the street as well. He easily could have. Okay. Let's move on to your sexual assault accountability argument. Do you mind if I just ask one more question here? I'm sorry if you don't mind. Go right ahead. The superheroes comments? Yes. So the sexual assault charge was not proven by the testimony of the police officers, was it? Was there any police officer testimony that went towards the sexual assault? No, not at all. So that couldn't have affected that verdict? I mean, specifically likening the superheroes to – I'm sorry, the police officers to superheroes. I suppose not. Okay, and then let me keep going here. The rest are the home invasion and the armed robberies. The police officers certainly did testify that – okay, well, tell me how that – how they're – okay, so you're saying they're – I'm also doing the same thing. I'm mixing up the two co-defendants. So with Cortez Moore, you would say it's only their – what is it about their testimony, the credibility or lack thereof, what was disputed about what the police officer said that makes the bolstering of their credibility harmful to you? I mean, is Cortez Moore denying anything the cops said? He was found with a mask in a wallet. Maybe he had a reason for it, but all the cops said is we found him, right? The police officers did say that they took those items from his pocket, yes. I mean, you don't dispute that? I can't. Right. So even if these police officers were improperly bolstered by the superhero stuff, what impact did it have on the evidence or on the jury's consideration? Well, I mean, I think it comes down to the possibility that he did pick those items up elsewhere. No one sees him coming out of the building. That's actually the offender, the co-offender who died waiting trial. So he's seen by an officer, Powell, who's approaching the building from the south. He sees – he proposes to see my client. He makes eye contact. My client runs the other way. Then the officer who's on the north side of the house, Polonio, he claims to see my client running. He gives chase. But he says he doesn't see Officer Powell, who said he was chasing my client as well. Polonio takes the chase. Then there's Officers Calhoun and Griggs who take up the chase in a squad role when they arrive. They don't see Officer Polonio or Officer Powell, even though Officer Powell claims he's directly in front of the apartment at the time. And neither Calhoun nor Griggs see Officer Polonio or acknowledge – and one, in fact, says Polonio wasn't there when they arrested the defendant, even though Officer Polonio claims that he caught up and was present and participated in arresting him. So as far as the timing and who sees whom, it does matter. In particular, it directly went to his defense that he wasn't there at all and he was just in the wrong place at the wrong time and ran from police. And I'm sorry, you'd ask me to go to another – Sexual assault accountability. Absolutely. Oh, I'm sorry. Could I pull you to the IPI? Sure. 306. 306. Which goes directly to the sexual assault. Okay. So they give him 306. And I read 306 and 307 together. Why would that apply to statements and not just utterances of the defendant with regard to the statements that were made in this case? They were talking about what the defendant said while the interactions were going on, while the crime was taking place. Right. Right? Yes. Okay. So your argument is 306 should not have been – the jury shouldn't have been instructed with 306, correct? No, no, no. Okay. 306, 307 is a combined instruction. I don't know why. Because it used to be statements like a confession and different statements that were uttered during the – Oh, okay. I didn't realize that. I'm sorry. In federal instructions, it's just hyphenated so they're always together. Right. I didn't understand. I didn't know there was a history. Okay. I apologize. No, go right ahead. So your position is that 306 was appropriately or inappropriately given? 306, 307 as given was incomplete. Because they didn't give the bracketed portion. Right, the bracketed portion that says it is for you to determine whether the defendant made the statements and if so, what weight. Instead, it simply read it is for you to determine what weight to give the statements. It was critical that the jurors be allowed to determine whether he made any of those statements at all. Because of the mask. Well, because there are masks, because the occupants attributed statements to different offenders and generally they weren't sure who said what. Once in a while, it was clear that Coleman, the unmasked one who did the sexual assault, it was clear that he made certain statements. But even then, Isaac Andrews, he kind of wavered on whether it was Coleman or whether he wasn't sure who said little vulgar things at AW before sexually assaulting her or as he was sexually assaulting her. So the fact that more obviously sexual assault. This is an accountability case, right? Sure. Aren't they sort of in for one? No, that's overstating it just a bit. They're all accountable only for acts done in furtherance of the common design. I mean, I think there's no question. So if they do some other crime that has nothing to do with their common design, then they're out. They're not accountable for it. So the fact that this guy committed a sexual assault in the course of the robbery, you're saying that wasn't part of the plan, so therefore he's out. I'm saying it was an independent, a wholly independent case. Wasn't the allegation that Mr. Moore was one of the people who held a gun on the woman and told her to take off her clothes, wasn't that the allegation against Mr. Moore? Nope. No, that was Coleman. She repeatedly said that it was Coleman. Right, Coleman was the one who actually committed the assault. But there were two men that came into the front bedroom at gunpoint, told her to remove her clothes before they marched her into the kitchen, correct? Coleman told her to remove her clothes. She wavered on whether anyone else did. We don't know that that other offender was Moore. And, in fact, she described him as taller. My client is only 5'7", which is not particularly tall. So it's not at all clear whether he's implicated in it. Plus, there is a break in time between remove your clothes and get on the floor and then taking her out into the other room, gathering them all into the same room, and then Coleman later, while everyone else is attacking the other occupants, saying, where's the stuff, where's the money, where's the whites? He does this thing all off on his own. It's completely foreign to the common design. Do you know what the common design was? According to Mr. Moore, do we have a common design? I mean, based on the evidence, I'm willing to say for the sake of the argument. How do we know part of the design wasn't to sexually assault whatever woman they found in that apartment? How do we know that, that that wasn't part of the plan, too? Well, because there's no threats to do it. There's nothing linking. It's quite clear from the multiple statements of various offenders, where's the white, where's the money, where's the white, tell us where it is, tell us where it is. And they did throw another crime in there at the same time? They're precluded from that somehow? Well, they're not precluded from it, but there's simply no evidence of a shared intent to sexually assault anyone. But, counsel, to Justice Burke's point, a second crime can spontaneously come about, right? I mean, I think you're probably on pretty solid ground to say this whole thing began as a robbery. I'm not aware of any evidence, and I don't even think the State would argue that there was evidence that when this began, they said, let's go rape a woman. But then they got there. And for whatever reason, they singled out one person among five people and decided to strip her clothes. And they didn't strip anybody else, right? They didn't handcuff any, you know, they didn't do any of those other things. And according to the gentleman in the room with her, there were actually two other people besides Coleman. And we don't know what they looked like because they had masks on. But couldn't a separate crime have erupted there? And by assisting Coleman in stripping her naked, unlike that anyone else was treated, that they knew exactly what they were doing. They were making it easy, making her vulnerable to a sexual assault. And even if that wasn't the original plan, can't that have also come up? I don't think we can take it that far. The order, you know, that she was ordered to remove her clothes, you know, is a humiliation. It's perhaps to keep her from trying to escape the apartment. Nobody else got stripped. That's true. She was the only one in so little clothing to start with. That was perhaps an opportune suggestion by Coleman at the time. Ms. Bontrager, I want you to be able to have some time for rebuttals. Sure thing. I'm just letting you know you've got about a minute and a half, okay? Okay. I lost my train of thought there, I'm sorry. But I do think that the sexual assault came about completely separate. It wasn't even separate from ordering her to disrobe. She was moved to a different room. It's still only Coleman. There's nobody else participating. All of the other cases involving something like this arising involve active participation by the co-offenders. The co-offenders are holding the victim down. The co-offenders are holding the gun on her. Holding a gun on her while she was ordered to strip, right? That's not entirely clear they had guns. It's not clear that they were holding the gun on her while she was ordered to take her clothes off. Okay, four in the morning, multiple armed men were in her room while she was being told to strip. Is that fair enough? I don't think all four were in her room. It was undoubtedly scary. She was not excited to do it. Of course not. But I do think that's separate and apart from the later completely independent act by Coleman and Coleman alone in sexually assaulting her. Thank you. Thank you, Ms. Bontrager. Mr. Spelberg. Good morning again. In response to the three issues which counsel had just discussed, particularly into the opening statement, it is well established that statements in opening statement cannot result in reversal of conviction unless they demonstrate material prejudice to the defendant in some way. Here, the allegation that refers to the defendant. Do you think that was an appropriate argument? As an opening statement, what it was was an assertion of trying to express the- Right. Do you think it was appropriate? I can't say it was inappropriate, Your Honor. Okay. I'm sorry. I understand the question you're asking. I don't believe it's inappropriate. I'm not a trial lawyer. I can't necessarily speak to the best means of catching the jury's attention, which is what opening statement is intended to do. We've just selected a jury. We're asking them to judge fellow citizens, and we have to catch their attention as to what this case is about. You don't think that was a slight bolstering of what their witnesses were going to testify? We're going to have these superheroes come in and talk to you. We're going to have superheroes come and tell you about how they saved the day that day. Your Honor, I don't believe that that was an attempt to bolster, because it was not linked in any way to their testimony. The counsel relies extensively in her brief on the Rivera case, where the argument and closing argument about police officers as heroes and what they do was directly linked as to why they should be believed as officers. What I believe what was happening here in this opening statement was trying to paint the picture for the jury about what happened. This eruption, as you stated, Justice Ellis, 4 in the morning armed men break into an apartment that would have continued on before the police officers barging in. That's why I believe that they were identified as superheroes. Whether or not it's something that I would have said as an appellate lawyer, I can't say. But in this case, there's no way that the defense can meet their burden of establishing material prejudice based upon it, because they were two very isolated comments that were never revisited throughout the trial. The court properly instructed the jury both before opening statements and at the end of the trial that opening statements are not evidence and they should consider solely the facts. And then finally, the evidence in this case was truly overwhelming. Mr. Moore, as you stated, Your Honor, was arrested within minutes after this occurred, outside the back of the apartment after being seen 40 seconds earlier leaving the area with the victim's property in his pocket, as well as a mask. This evidence is just incredibly airtight. There is no question that he was involved in this and committed this offense. Can we talk about the I.P.I. under 306? Absolutely, Your Honor. All right. What do you think? Did you think that this was an I.P.I. geared toward statements that are made during the course of the crime, or is it geared to a confession that's given in the police station after the crime? Your Honor, Your Honor, Huffstet wrote that typically 3.0607 is given in situations where there is a statement amounting to a confession in some regards. But it is not specifically limited in that regard. Instead, it does talk about statements by the defendant. But we don't know any of the statements that were made if they were uttered by the defendant. How did he put that on him? Well, Your Honor, that's exactly where I was about to go with that. As we argued at the instruction conference, all the statements that occurred during the utterances of this offense, the 25 minutes or so of the offense, were offered as co-conspirator statements, meaning, as Judge Fore found, they were admissible against all of them because they were as if they all had made themselves. And you think 3.06 is an appropriate instruction for those types of statements and not confessions? I do not believe it's an abusive discretion to give it in that regard because 3.06 doesn't say not to give it. It is sometimes given. I have seen in other situations where you have contemporaneous statements being made. I think that it would have been fine not to have been in this case, but I don't believe it's an abusive discretion to give it. But in terms of the person … It doesn't make the slightest bit of sense, does it, in this context? Does it make any sense? I mean, if you read the jury instruction, it says, whether the defendant makes statements relating to the offenses charged in the indictment, then you should, you know, if we take out the bracket language as happened here, it is for you to determine what weight should be given to the statement, consider all the circumstances under which it was made. That's nonsensical. We're talking about threats, isn't it? Does it have any place in this case? Your Honor, I disagree that it's nonsensical because I think what it is, it's directing the jury that they can consider these sort of amorphous statements as to what's going on in the midst of this very chaotic experience and to decide how to address them, how much weight to be given to them. I think that it is in the best ways of protecting the defendant of allowing the jury to consider that they have the freedom to decide how much weight to give to these statements. In regards to the precise allegation the counsel is raising about the failure to give the bracket language, that language is given when the defendant essentially challenges making the statement. That's when it's supposed to be given. But there was no challenge that these statements were being made in the midst of this experience, of this horrible crime. What wasn't known is who of the offenders made those statements. And because they were admitted as co-conspirator statements, and this is what Judge Ford ruled, because they were admitted as co-conspirator statements, they were admissible against all of them. And since they never contested that they were made at all, the bracket language wouldn't make sense. It would make it even more nonsensical and be a problem to your honor. In regards to the claim that the sexual assault is beyond the scope of the common design, I can honestly say I don't understand this argument. Because if you read Fernandez, which we cite extensively in our brief, what the court held, what the All-Michigan Court held, was that when you embark upon a criminal design, when you join a group bent upon criminal activity, you are responsible for all crimes that are committed by your fellow offenders. That is the law. That has been the law for 100 years, as Fernandez explains. In particular, in the Fernandez case, they discussed the Kessler case. Kessler was involved, a defendant who was the getaway driver and a burglary. He didn't know that they weren't expecting anybody to be in the building. When they get there, they come across an individual, the other two co-defendants. The other two co-defendants find a gun inside the building where they were trying to burgle. They leave, and as they're leaving, the other two co-defendants shoot and kill somebody. Kessler said he shouldn't be held guilty for a murder, shouldn't be responsible for a murder, because he didn't even know they had a gun. And the Supreme Court in Kessler, and then reaffirmed in Fernandez, said absolutely. Because he was part of a group bent on illegal activity, the common design fit within him. There is no other way to say that this is an appropriate scenario. The defendant here, Cortez Moore, without any dispute at all, engaged in a home invasion, a violent home invasion at 4 in the morning with guns in a robbery, allegedly, from what we can tell, in order to steal drugs. While there, one of his fellow offenders, one of his co-defendants, chose to digitally penetrate the victim. That is an aggravated criminal sexual assault that is responsible, that goes to all of the offenders in that case. They all share equally the criminal culpability. And there can't be any dispute about that. Fernandez makes that clear. And so, given the strength of the evidence in this case, the fact that this was an extraordinarily dangerous period that was only staffed, thankfully, with the police barging in with their guns drawn, we would ask this court to affirm the defendant's convictions and sentences. Thank you. Thank you. Can I just add one thing? Of course. This is just a personal observation. I've been around for a long time. In the 60s, when state's attorneys would argue a matter, they would go to the truth of the matter. Because you represent all the people in the state of Illinois, not just some of the people, but all the people. And if the state's attorneys aren't going to be truthful, then who is going to be truthful? And when you come before this panel, and you argue that that opening statement was not improper, your argument should be that it won't make a difference because the evidence was overwhelming. But when you say it wasn't improper, you know in your own heart that it was. Everyone knows that it is. It is what it is. You can't call a cat a dog. It's a cat. You see, it's not the question of winning or losing. It's the question of how you play the game. And if the state's attorney is not going to be truthful, who in the world is going to be truthful? And that's just my opinion. Thank you, Your Honor. Thank you, Mr. Spelmark. Thank you. Ms. Barnhart. Just two quick points for Your Honors. First, as far as the opening statement goes, it was not an isolated comment. This was the entire theme of the prosecutor's opening. She talked at length, and she even returned to it later on. She opened with it. It was the theme. She ended her opening with it. She also did then return to it briefly in closing to say that the police acted bravely, which is along the same lines. Secondly, on the Fernandez case, it does not say that a co-offender is on the hook for any and all crimes perpetrated by all co-offenders. It says you're on the hook for any crimes done, I'm sorry, all crimes done in furtherance of the common design. So let me run with that argument that you have for a second. So everybody decides they're going to go do an armed robbery, but they're not going to kill anybody, and they say that to each other. We're not going to kill anybody during this armed robbery. They go in, they rob a place, and one of them kills somebody. So under your theory, that wasn't part of their plan, so he can't be charged under a theory of accountability. That's a tougher call. It's not. It's the exact same argument you're making, and it's ridiculous. It turns accountability on its head. It's any crimes that occur during their conspiracy. And how are you saying that just because this one guy committed a sexual assault, then he can't be held accountable? That's ridiculous. It's an independent act, but it's outside of their common design. The Fott case, the old Fott. Well, okay, in my armed robbery, the murder was completely outside of their design. In fact, they agreed not to commit any murders. So under that theory, he can't be charged under a theory of accountability. I mean, an armed robbery where they know they're going in armed, I think that's not so much that it's foreign to the common design. They have the common design to do an armed robbery. I think they are on the hook for murder in that instance. I mean, there's the old Estrada case where there's two individuals who agree to do a robbery, and an individual ended up murdered. This court reversed the condition for murder for the offender who did not do the shooting because he did not know his co-offender was armed, and he did not know that his co-offender would shoot the victim. This is similar to that where the common design is to rob money and drugs, and the sex assault happens so that it's an independent act, wholly unrelated to that common design. All right. Thank you, Ms. Blunt-Street. Thank you. Thank you both. We will have an order for you as soon as possible. Okay. Thank you.